My name is Harvey Ryder. I'm appearing on behalf of the municipal petitioners. With the Court's permission, I'd like to reserve two minutes of my time. Would you move those microphones closer so we can hear you? Is that better? Yeah. Nearly 10 years ago, the Federal Energy Regulatory Commission stated that the refund and rate-setting provisions of Section 206 were entirely separate and that when Congress added the refund provision in Section 206B to the Federal Power Act, it did not intend to give the Commission the power to revise rates retroactively. The Commission now says that by granting the Commission power to order refunds, Congress must have given it authority to revise rates retroactively, too. They said that in the very same case in which they said the opposite. We now find ourselves, five years after this panel's decision in Bonneville, forced to defend a breach of contract suit that by the plaintiff's own account, the intervenors in this case, would not have survived but for the Court's – but for the Commission's ruling. That's harmed us substantially. And we appreciate the Court's agreement to accelerate oral argument in this case. We briefed the agreement and the standing issues. And unless the Court has questions on those, I'd like to turn to the courts. I do have a question. I thought that might be the case. Right. Because all your other arguments might not be so useful if you don't have any standings. So would you articulate more specifically what the specific injury you have? The most specific injury we have, Your Honor, is the preclusive effect the trial court has accorded to the Commission's decision that it has the authority to revise rates retroactively. The plaintiff's entire contract breach suit hinges on their argument that we contractually agreed that if FERC revised rates retroactively, we would be bound by contract to pay refunds. So let me just ask you this. If the – just hypothetically, if their authority to revise rates retroactively in the broadest sense were not ruled on, but it were determined that the refund power and the rate-setting power are derivative and therefore would be inapplicable to the public entities or the nonpublic utilities, what would be the effect of that kind of a ruling? I suppose that would make us better off. It wouldn't completely resolve the issue, because it – and I think that there are several lines of cases that talk about what the court can do when a party is aggrieved. One thing is that they might vacate the decision and say it has no preclusive effect. In cases like that, in the electrical fittings case, for example, the Supreme Court later in Roper described that as resolving the case fully, because in that case, I think in electrical fittings, they had said that there was a patent – there was a valid patent, but it wasn't infringed. But the court, by vacating that, as the court said in Roper, describing electrical fittings, said, well, that resolves the case altogether. If we're left with a non-decision effectively on whether FERC can revise rates retroactively, then the court may go back. It will be in a position where it has to interpret the Federal Power Act. It may come back to FERC, and we can try to do that. Kagan. Well, State courts do that all the time, don't they? Yes, I suppose that they may, but the court itself has shown some reluctance to do this, and they will certainly – courts when they're faced with it. I know, but that wouldn't look too good if we, like, wrote a standing decision that was predicated on a State court's reluctance, for example. No, true, Your Honor, but I think that the cases – in fact, probably the case that's closest on point on the agreement is the D.C. Circuit's case in AT&T v. Federal Communications Commission. There, the commission, that commission, ruled that AT&T owed an access charge to another telecommunications provider, but it says, we're not ordering you to pay that. Kind of similar to what FERC has said in this case, we can order rates to be revised retroactively, but we can't order you to pay refunds. The court in that case said that the plaintiff's – the plaintiff AT&T was aggrieved and it was entitled to a remand on the merits of whether or not they're – they actually had a contract – a tariff obligation in that case. Well, let me ask you just from your perspective, when we issued our ruling in Bonneville, of course, they had – they went back and in respect of that ruling said no refund. The clarification and other orders that are under appeal now, was there a reason in your view that those were entered that extended beyond your group of clients? I don't think so, Your Honor. I mean, there wasn't any real necessity for the commission to venture where it did. I can't read the commissioners' minds, but they turned on a dime in reversing their October order to say that the – that they had authority to revise rates retroactively, and it was only at the prompting of the plaintiffs in the court case who were the interveners in the FERC proceeding who argued that their case in State court would disappear if the commission didn't grant that clarification or grant rehearing. So in that sense, they ventured beyond what would have been necessary simply to return the money that we're owed because the commission unlawfully ordered us to pay a refund. I don't see that being the case. So you can argue that in the State, in your contract action, right? Yes, Your Honor. I think we could. So what's the issue here? I mean, we're not – we've already said FERC can't order you to pay refunds. You said that there might be a contract action. It didn't say whether you had one or not.  Where's the FERC injury here? Well – The injury, I think, for Article III purposes is not whether there's a FERC injury to us, but whether there's an injury to us resulting from the FERC determination that the – that it can revise rates retroactively, because it does have that consequence in the State proceeding. As I said, I think the 18t case was similar. The ruling in that case that the utility owed access charges to another utility was significant because there was pending litigation in which they were being sued for the access charges. I think in that sense, the consequences are very similar to the ones here. We're being forced to continue to litigate if we don't get a decision based on the clear meaning of the statute, which I think is within your power to decide, because of the Article III injury. We'll be faced with further litigation that would be ended with a clear decision that the commission has no authority to revise rates retroactively. Would it matter if they – instead of formally revising rates, they said the following would be or would have been fair and reasonable at the time, and simply make what appears to be a factual finding without purporting to actually change the rates? I'm not sure what significance a ruling like that would have had. That's – I suppose they could have ventured some observation like that. I'm not sure what – Well, would they have occasion to make a judgment like that in the context of some other utility provider? I mean, a public utility. No, I think – and this is where we do get into the statutory scheme. The commission is only permitted under Section 206B to establish a refund effective date and to calculate refunds at its discretion based on the difference between the prospectively set rate under Section 206A and the rate that it – that was charged. And in this case, for example, the sellers – not all sellers were required to pay refunds. Some of them were charging rates below the mitigated market clearing price. The statute was – So in effect, in answer to Judge Clifton's question, there was a determination under Subsection A as a predicate to B, correct? There was a – yes. The fair market or the fair price and this clearing price. The commission in June had determined that rates were unjust and reasonable and prospectively set the rates to be applied. And I think this Court has said that when the commission acts under Section 206A, it has to establish the just and reasonable rate to be observed thereafter, from – that is, from the date of the decision. There's no dispute in this case that Section 206A only operates prospectively. And as the D.C. Circuit said in the Exxon case, Section 206A is the only mechanism under Section 206 for revising rates. That makes this a relatively simple case on the merits for this Court to decide. And as this Court said in Nigg v. Postal Service, where you have a clear and unambiguous statute in existence, Section 206A, the only way a subsequent statute, in this case Section 206B, could be read to take away the – to give the commission powers that it's entirely denied under Section 206A is if there would be a complete repugnance between the two statutes. We know that can't be the case. The commission says that it must order – must have the authority to revise rates. It couldn't possibly order refunds if it didn't have retroactive rate-meeting authority, but it's been able, for some reason, to do the impossible for over 20 years, ordering refunds in 206 cases without ever revising rates retroactively. We've invited them to cite a single instance in which that has done. So what precisely is the remedy that you seek here? The remedy that we've asked this Court to grant is to rule that the commission acted beyond its authority in declaring that it has the authority to revise rates retroactively and to vacate the orders in accordance with that ruling. That's the question. You're down to almost a minute. Do you want to reserve? Yes, I would like to. Thank you, Your Honor. May it please the Court, Mark Pennick, U.S. Department of Justice. I represent the other two Federal agencies, Bonneville Power and Western Area Power Administration. I agree with everything Mr. Reiter said, and I particularly want to stress something about how my two clients are dramatically affected by this, because as this Court said in Locker, the interpretation of the Federal Power Act has to be such as to give it a coherent regulatory scheme so that the interpretation results in that. And I said further that not only is the plain language interpreted by reference to the words themselves, but by a common-sense application of the principles underlying the Federal Power Act. That's at page 1016. That's what we're asking the Court here to do today on merits. And it's particularly now that we're going to do that. FERC would say, well, even if we agreed with you, we haven't even done anything to you. Oh, but they have. Okay. So tell us what that is. Well, first, we're in the same situation that the other governmental sellers are with respect to the sales that took place. But it's even more egregious as applied to these two Federal agencies whose sales are governed by two entirely separate statutory schemes that sub-plan expressly FERC's authority to regulate. Not only are we not regulated under the Federal Power Act, but our grades are set by reference to standards that expressly disavow what's just and reasonable under the Federal Power Act. The administrator, when he made these sales back during the refund period, was making the sales on the basis of the criteria established in the Northwest Power Act and the criteria established by the Western statutory scheme. If this – if they had known then that the mitigated market price would be applied retroactively, those sales may not have been made, not because we're afraid of being afraid of a refund liability, but simply because it wouldn't have been permissible under the criteria established by these two other Federal regulatory schemes administered by these two agencies. The administrator makes that decision when he decides to bid, when he decides to participate in the market at all. It's one thing to do so on the basis of the State contract action. It does affect the State contract action, because now what we're being told is that the sales we consummated before under this regulatory scheme are now being subjectively revised under a revised tariff, if you will. I understand that, but I think Judge Clifton has the same question I do. Why can't you raise that as a defense in the State contract act? Because under the city of Tacoma, FERC's interpretation of the Federal Power Act is preclusive. If FERC says there's a moon made of green cheese under the Federal Power Act, the Court of Federal Claims is going to have that as binding. The Superior Court of California is bound by it. There is — they simply will not revisit the question of whether the moon is made of green cheese under the Federal Power Act. Well, but I may be missing something here. You're saying, in effect, that you don't have a contractual obligation to impose FERC fair and reasonable rates, that your agreement with the people that bought from you presumably is something different. So whatever FERC decides with regard to the rates wouldn't seem to have any applicability. Everybody who sold to the ISO agreed to be bound by the ISO tariff. The California party — But your defense — not to interrupt, but I think your defense is, look, we're still bound by that tariff. Whatever FERC clarified subsequently has no bearing on it. So that's your defense in the contract action if this goes forward, right? I think your argument is, as a practical matter, the courts may give a different effect to the FERC order, but why is that an issue for the courts in that case? Your Honor, the situation then becomes this. If the Court were to say we have no standing, the Court of Federal Claims and the Superior Court of California would then look to what FERC did in these orders. And they're going to say, well, FERC is the expert agency on this. They have primary jurisdiction. So even if they're not conclusive, they're at least compelling and persuasive and will proceed on the basis of that. That's Article III standing. We have that in it. Just to have you in that — We're talking about standing. We're kind of well beyond standing, too. On some level, what's wrong with a State court using its own authority, deciding, well, that's the best source to turn to as to what the numbers should be? What argument do you have against that that we should be listening to? That would be the city of Tacoma decision by the Supreme Court, where it said that this Court, the Courts of Appeals, have the exclusive review authority over FERC's orders. If you don't exercise that authority, you have the truly anomalous situation where the Superior Court of a State and the Court of Federal Claims, which has no expertise in this area at all, will be construing the meaning of the Federal Power Act and FERC's authority to exercise review. I haven't heard an argument. I don't think I've heard an argument. I confess I'm still adrift in a sea of paper, but I'm not hearing an argument that says FERC's decision is factually incorrect. I'm hearing an argument that says FERC should never have decided that, doesn't have the power to decide. But as to the factual question, which you said is binding on the State court, that you think we have the authority to review? No, Your Honor. We're not being asked to review that. We have a sole legal question before you, not a factual question. Sole legal question before you, does FERC have the power to make rectal action revisions to a tariff under Federal Power Act? With respect to the law, let me – because I understand the way this case is divided up, there may be questions out there that are relevant I don't know about. Is there an issue out there that hasn't reached this panel yet with regard to the factual determination made by FERC as to what's fair and reasonable? You will never reach this panel with respect to whether or not there's a contractual obligation. There is certainly a factual obligation on page 3 of these proceedings as to whether FERC sets a proper fair and reasonable rate. But none of that's pertinent to this case. This case is a bare legal issue whether FERC has the legal authority in the Federal Power Act, particularly as to my two clients, to reset tariffs retroactively. That's – that has got nothing to do with the contractual issues. But the – but the – since they cannot – here's the conundrum, obviously, is that they can't order the refunds. We've already made that determination. So the outflow of this sort of after-the-fact order that FERC initiated would be – are you basically saying it's tantamount to ordering a refund? Well, it's tantamount to establishing a predicate for liability in the contract actions, which is precisely what the California parties told FERC when they asked FERC to reverse itself in – from its October order. And they came out and said if you – if that's the order, if that's your interpretation that you don't have retroactive rate-meaning authority, then that order results in irreversible prejudice to our contract actions. And after receiving that pleading from the California parties, within 30 days, exactly 30 days, they flipped and then took 18 months to review our petition for rehearing. So there's really no dispute here about the irreversible injury to the parties. Somebody's going to have irreversible injury. It's either us or the California parties. With respect to – with the assertion of power that FERC has made in this case. That's a clear legal issue. That's the only legal issue before you. Now, with respect to BPA and Western, you have to look at the construction of the Federal Power Act in conjunction with its – the Court's history of construction of the Northwest Power Act and the scope of discretion that the BPA administrator has under that statutory scheme and the lack of power FERC has to regulate the sales of the BPA administrator and the Western administrator. Well, every injury that the other governmental sellers have, we have, and then we have more, because here we're defending our statutory scheme, the right of the BPA administrator and the Western administrator to make sales without constraint as to what FERC thinks is the proper rate under the Federal Power Act.  Your time is up. Thank you, Your Honor. Good morning. Lona Perry for the Commission. I'd like to begin with the standing argument. It is the Commission's position that there is no injury to the Petitioners from the Commission orders that were issued in this proceeding because the only substantive action that was taken in those orders was to absolve the Petitioners from refund liability, which is not injury to them. Well, that's not exactly fair, because that's what you did initially, but then a second thought went further, correct? No, Your Honor, because what the Commission did was it clarified a statement that it made originally in the remand order to make it consistent with prior precedent that the Commission had already issued in the refund proceeding, which had already been reviewed by this Court. So these orders did nothing, imposed nothing with respect to revising the rates or to determining in the first instance that rates were revised. All these orders did was conform a statement that was erroneously made in the first instance to what had already been held in the refund proceeding. Well, you say that that was held, but it really wasn't the issue. This never was really held by this Court. I mean, it's interesting because FERC says, no, we don't reset rates, and then it later changes its mind. Then you take one sentence or word from our ruling and say, well, but you meant that. I mean, there's sort of these little word things. So what you come to here is once we said that you didn't have the authority to order refunds from these parties, why shouldn't that have been the end of story? I mean, no refund over, vacate the refund order. Wouldn't that have carried out the decision of the Court? That would have implemented the remand of the Court in the sense of we were required to vacate those portions of our orders that ordered them to pay refunds, certainly, as a result of this Court's decision. But the commission still was asked to, in that proceeding, talk about what it did with respect to the end refund orders back in the 2001 proceeding, what it did with respect to the jurisdictional ISO and PX tariffs. And so I just want to understand this, because you guys speak in a lot of these acronyms. So are you saying that the 2001 complaint still left open how you would handle refunds to the jurisdictional parties or not? That is, to parties that don't fall in the camp at that table? Or the rates. Or the rates. The commission, in revising the rates, had to do with calculating refunds with respect to the jurisdictional PX and ISO tariffs. And that's what the commission said in these orders as well. That was the purpose of revising the rates. No, I'm only talking about these. I'm not – I know why you would have revised the rates, and I know why you'd like to do it. What I'm trying to figure out is procedurally why it came about in these orders that are under appeal. It came about in these orders that are under appeal simply because the commission in response to a pleading by the California parties said something that was inconsistent with its prior decisions, and it had to correct that mistake. But the fact remains that in the refund orders originally, that's where the commission held that it was revising the rates. Right. So, I mean, if you said nothing at all in either order, the argument would be then in the contract actions, what was the effect of your revision of the rates as to the jurisdictional parties, right? That's exactly right, Your Honor. If we had – if nothing had been mentioned in any of these orders about the revision of the rates, the 2001 orders which said that the commission, in fact, did revise the rates would stand. So their argument is, look, you didn't need to take that extra step. Now you've implicated us by saying we're resetting the rates. Your argument is we just revised language to make sure we're being consistent with what we're doing in the other case. Is that where we are? That's right, Your Honor. We just revised language so that we – because it was inconsistent with what we had said in the 2001 refund orders. But your authority to revise the rates to the extent you have retroactive authority, let's just assume you do, it would only exist as to the jurisdictional parties, correct? Because it – as you argued in your brief, I thought it is derivative of your refund power. It is, but you have to recall, Your Honor, that the jurisdictional tariffs that we're revising are the ISO and PX tariffs. And so this is why you – You're saying it would be the same in whichever parties we're talking about, that the numbers that would be set as fair and reasonable for jurisdictional parties are exactly the same numbers that are set for the public utilities over which you don't – or the governmental utilities over which you don't have jurisdiction? It would be the same. The mitigated market clearing price, which is the commission was using as the benchmark for the just and reasonable rate, is a number that's being set under the PX and ISO tariffs. And so it would apply equally to anyone – and this was the justification for ordering refunds from the governmental entities. But it would apply equally to everyone who participated in the market. That's the just and reasonable rate. And the – and the thing you have to bear in mind, Your Honor, is that the jurisdictional tariff that we're talking about here is the ISO and PX tariffs. Correct. And that's why it's relevant in the contract action is because they agreed to abide by those tariffs. And so it's not a question of we are revising only the tariffs of the sellers in the – or in the markets who were ordered to pay refunds. What we're doing is revising the ISO and PX tariffs. No, I understand. But the – but the – your authority to the extent it exists has – have parties that are subject to your jurisdiction for purposes of refund. And so if you're saying that there's no reason to be concerned that the tariffs of the sellers and the refund challenged your ability to reset the market rates. No, Your Honor. Not that I'm aware of. This is the only – And they wouldn't really need to, correct, because they have to pay the refunds if you order them to. Well, isn't that really, I mean, there would be a distinction without a difference for them to challenge it, right? Except that I gather – I mean, not to interrupt the question, but if we held that we didn't have the authority to reset the tariffs in the first place, that would affect the refund, right, for the jurisdictional parties. Yes, Your Honor. I mean, that's the Commission's position is that this has to – our authority to issue refunds inherently requires that we be able to – No, no, no. But we're talking two different things. You have – as we've already said, you have the authority for jurisdictional parties and you don't have the authority for these. The question is you need to reset – retroactively, quote, reset the market rates in order to order the refunds. You don't – wouldn't need to, in effect, reset them. You just order the refund based on the new market clearing price, correct? Well, the Commission's position, Your Honor, is that the nature of refunds itself requires that we be able to reset the price to the just and reasonable level, and that, you know, absent the ability to do that, that we don't really have the legal authority to issue refunds. And that requires that we be able to determine the just and reasonable price and substitute it for what was originally charged and order refunds based on that. Well, let me ask you this. What if – is there sort of variation on what I asked the other parties? And they said, well, it wouldn't really be a complete solution for them. But in your brief, you talk about – you say you – that Bonneville and their arguments are really not relevant to whether you may reset rates in tariffs of jurisdictional entities, the California ISO and PX. So my question is whether – what would happen if somehow the Court said that your ability to make that determination doesn't exist vis-a-vis non-jurisdictional parties because your power to do so flows from your jurisdiction – your refund authority? Your Honor, I don't believe in the circumstance that it would really change anything. Because, again, what we're changing is the PXISO tariffs. And in the contract – I mean, they're already – we can't make them pay refunds. But the issue in the contract case is when they agreed to abide by those tariffs, are they then subject to those revised rates? And so, I mean, we have no – we're not a participant in the contract action, and we have no stake in that battle. Correct. But that's the issue that's presented. So if we have the jurisdiction, as we do, to alter the ISO and PX tariffs, the implications for that in the contract action are to be resolved there. But essentially, if their contractual obligation is to abide by those tariffs, then it would have implications for their contractual liability. Well, even if you didn't – I mean, you've – you want to – at one point, you said you didn't really have the authority to reset rates, and then you changed your view, apparently, or clarified your view. But you can order refunds without actually resetting rates, can't you? I mean, you have to determine what the fair and just price is under A, and then you import that price into B and order a refund of certain parties, right? Well, what the commission does when it orders refunds is it determines the just and reasonable rate, which then basically becomes the commission-authorized rate, and the parties have to charge the commission-authorized rate and are therefore obligated to pay back what they received in excess of that. And in the commission's view, that requires the actual – that the JNR rate, the just and reasonable rate – sorry about the acronym – be substituted for the unjust and unreasonable rate in the process of making jurisdictional utilities pay refunds. But then you're coming down to – I mean, this is sort of a question of semantics then, because, sure, you're using the new market price to figure out what the refund is, or the new adjusted mitigated clearing price to figure out the refund. What do you think the difference is between resetting the rates retroactively and using the mitigated market price as one of the plug numbers in your refund equation? Well, it's the difference, Your Honor, between leaving in place essentially as an approved rate an unjust and unreasonable rate or replacing it with one that the commission has determined to be just and reasonable. And if you look, for example, at the cases under 205 that we cited in pages 34 and 35 of our brief, and also the Anaheim case, I mean, it's been generally observed by the courts that in setting refunds the commission retroactively revises the rate because it goes back, determines what would be a just and reasonable and therefore commission-approved rate, and then requires refunds. And there's really no basis to believe that the Congress, in giving commission refund authority in 206B, intended somehow to, in contrast to the case law and the interpretation of 205, to decide that refunds under 206 had some technical distinction, that it was actually just a mathematical calculation and actually had nothing to do with resetting the rate to a just and reasonable level, which is the purpose of providing for retroactive refund authority. Well, but you have, of course, 206A, which has been into effect many, many years, only talks about prospective authority. That's right. The refund authority that you got later in life, I guess. But is, and I take it your view is that the word effective in there doesn't really relate back to subsection A in the subsection B language. The subsection B language, I think, is properly read as a recognition that the Congress was intending to add on to the prospective relief authority we already had in A, the refund authority in B. And I don't think that that sentence really can be read as implying more than that, that they intended to incorporate this technical distinction with the way refunds had previously been interpreted to the way they are now. I think that they were just trying to say, in addition to this prospective refund authority you had to be thereafter observed, we are adding in this retroactive refund authority also. Why would, in terms of standing, and for us to then take a look at the merits of what you're arguing, why wouldn't this be really a collateral effect of your refund order and have potential preclusive effect that would come within an exception to the traditional standing? I don't think that this order has a collateral effect because there wasn't anything, the substantive decision to revise the rates was not made in these orders. And the actual revision wasn't made in these orders, and this Court reviewed that decision in the CPUC and in the Bonneville cases, and there was no argument made about revising the rates, and there was no challenge to that, and the Court did not overturn it. And so in this case, the collateral effect really is from the holding in the refund orders, which have already been reviewed and are beyond this Court's jurisdiction now, as opposed to these orders, which did nothing other than, I mean, literally quote the refund orders and say, you know, we're sorry, we said something that was contrary to this. This is what we meant, which is what we said before, and that's all. There was no substantive effect, no application of that in these orders at all. Justice, I mean, I think your argument is it's more technical than substantive, and their argument is, look, when you say tariff, you mean tariff. A refund is a mathematical calculation, and you don't have the power to reset the rate of a tariff retroactively. And that our contract, I assume this is what they're saying, I haven't read the contracts, but our contract is tied to the tariff, not to any mathematical calculation on the refund. And therefore, it didn't have preclusive effect until you said we're resetting the tariff in 2001. That's the point. All we did was quote that language in these orders and say we acted inconsistently with that. And so my point is, we did that back in 2001, and that has already been reviewed and is not before the Court now. The only thing that happened in these orders is we said, we said something that was inconsistent with that, and we took that back. But when you say 2001, are you talking about the order that then came up to us? In the separate case. In the BPA case or the PUC case? Well, they're really the same order, Your Honor. Right. But I mean, so in other words, if they were challenging the authority to have any refund, it wouldn't have been in that case. That wouldn't have been the issue challenged about whether you reset the tariff. It would have, Your Honor, because when you – and if you look, for instance, at page 919, I think it is, the Bonneville case, you see that the basis for ordering refunds in the first instance from the governmental entities was this conclusion that we were revising the tariff rates. And so, therefore, when they were challenging that conclusion, the argument would have been, you would assume, if they believe as they do now, that they would say you can't order refunds from us because we're governmental entities, and furthermore, you do not have the authority to revise the rates retroactively. And so that's the second reason why you can't do what you're doing in these orders, because they certainly were aggrieved by the award of refunds against them, and the basis for awarding refunds against them was that the commission said it was revising the rates. So at that point, they – Except that they're talking – you know, talking tariffs and – I understand your argument, but I mean, I don't think they contemplated the contract actions that we left hanging out there in dicta in our opinion, perhaps. But the fact remains, though, Your Honor, is that we made this finding and they were aggrieved by that finding. I understand. And if they believed it to be legally erroneous, they were obligated at that time to bring it up. Let me ask you, maybe I'm just – what practical difference does it make to FERC whether it orders a refund based on just and reasonable rates or orders a refund and at the same time resets the tariff to the just and reasonable rates? Well, the commission's – it is significant to the commission in the sense that the implication here is that the commission has no authority to reset retroactively the jurisdictional tariff rates. And it's the commission's view that under the statute it does have the authority to do that. No, I understand that. I just – what practical difference does it make to you? I mean, the result is the same. You do the same mathematical calculation, right? That's right, Your Honor. And, you know, most times it wouldn't have any effect because you could make jurisdictional entities pay refunds either way. Right. But the commission just doesn't believe that to be a proper interpretation of the statute. Correct. But let's say that we were to hold that you didn't have the authority to set rates retroactively. What's the practical effect in this – in the jurisdictional cases we have? Well, in these cases, Your Honor, I don't think that it would make any difference in terms of being able to award refunds against jurisdictional entities. But I really can't anticipate what circumstances that might arise in the future arising from that. I mean, it has been consistently interpreted that refunds are retroactive rate revisions. And to now – Well, it sounds to me like a Judge Levy issue to a degree. I mean, in other words, not conceding that the jurist – that you don't have the authority, but what you're saying here is it really – it doesn't make any actual difference to your ability to order refunds. Is that true? In this case. I would say that's true in this case, Your Honor, but – In this case. I won't worry because we don't want to get into any other than our 180 cases that we have. We don't want to get into all your other cases. So in these cases, if it didn't make any difference and you didn't have a ruling that in any way restricted your authority, you'd be no worse off, correct? Well, Your Honor, if you issue an opinion that says that we do not have authority to retroactively reset rates in issuing refunds, I'm not – I mean, that has global implications for us. Issuing refunds – Well, that's what I'm asking you what they are. Right. So that – I'm trying to – you know, you basically said that – I'm sorry. Yeah, go ahead. I mean, that's what I'm trying to get at. What are the implications for you outside this case or to the jurisdictional cases if we were to hold that? I – you know, standing here, Your Honor, I don't know the answer to that, but I would be really reluctant to say that there is no possible repercussions from such a measure. Well, I wasn't asking that. I just asked what you've – you know, you practice in the state of law. You do it every day. What's the difference between allowing you to say we're retroactively resetting the tariff and saying, no, you can't do that technically, but you can order a refund with the same mathematical calculation? I don't know, Your Honor, standing here. I mean, I don't have an example of where that would be a problem. Let's just assume that there could be because it's always hard to figure out the cases that aren't here. But in this case, I heard your answer to be that there would be no practical effect because you've already ordered the refunds, correct? That's right, Your Honor. So – Well, they're still in calculation, but, you know, there's not a final determination. Right. They're in the formula. They're in the formula. Right. But there's no real difference between whether you call it a tariff change or simply this is the recalculated, you know, market clearing price. So if it wouldn't have any effect there, what would be the effect of a ruling that would simply say vis-a-vis the non-jurisdictional utilities that you didn't have that authority? Would that have ripple effect? I'm sorry. I don't think I'm quite following the question. Well, if it was a narrower ruling and it would say that vis-a-vis non-jurisdictional utilities in this case that the commission didn't have the authority to actually reset the tariff, per se. I'm having a hard time, Your Honor, envisioning how such an order would be written when it's a matter of statutory construction. I mean, that's what I'm not – Leave that to somebody else's creativity. But just imagine it could be written. You know, maybe it can't be, but just imagine it could be. That wouldn't box you in elsewhere, would it? You know, Your Honor, I don't know. And with the new statute that now allows certain refunds to be ordered as to non-jurisdictional entities, I mean, I'm just not sure how all that would play out. Okay. That's fair enough. Okay. Our questions have taken over time. Do you have any further questions? Okay. I think we have your hand. Thank you. And we'll hear from Mr. Roberts. Good afternoon, Your Honors, and may it please the Court. I'm Richard Roberts, and I'm appearing here on behalf of the California Parties, and we are in support of the FERC order in this proceeding. Now, the question that was asked just at the end is, what's the practical effect? Why does this matter in this case or globally?   In the current ISO, we have sellers who are subject to FERC's jurisdiction and sellers who are not, and this is duplicated all over the country. Now, in the current competitive market landscape, and in these markets, especially as a result of this Court's decision five years ago in Bonneville, the parties have carefully entered into contracts through which all of the parties agree that they will abide by FERC's orders and FERC's tariffs. This is necessary because there must only be one set of rules of the road. You can't run a market like the California ISO if some parties are not subject to the same rules. So we're using a contract approach in order to keep everybody under the same set of rules. If it were a determination by this Court that when FERC orders a refund, which is simply another way of saying that the authorized rate has changed starting on the refund effective date, that that's not a change in the tariff that half of the market has only agreed to by contract to abide by the tariff. That's only a refund that affects the other half of the market. Then you're going to have a situation where all over the country, parties, jurisdictional parties, are going to be unwilling now to do business with and engage in these markets with parties who are now not subject to the same set of rules. The Alliant case, which this Court cited with approval, it's a very important case recognized throughout the industry, that case states that you need two elements in order to bring a contract to action against governmental entities. The first is a FERC order that revises the rate market-wide. It's a multi-party rate. It applies to jurisdictional and non-jurisdictional sellers. And FERC issues an order because it's a FERC jurisdictional rate and says that's changed. That's step one. Step two is an action before a contract court to determine whether, in fact, the governmental entity signed a contract where they promised to abide by the tariff, as it is subject to FERC's regulations. The Alliant Court said that's not an exercise of FERC jurisdiction. That's simply the court finding that they have promised in a contract to abide by FERC orders. Now, the Alliant case is directly on point. That was an order as to a past period. FERC's order was a refund order. FERC had no other authority in that case to change rates for prior periods any more than it does here. But that refund order was properly interpreted by the court and Alliant as a change in the rate. Because that's all a refund is. Yes, Your Honor. It seems like there's three periods potentially at issue. One is a prospective rate under A. Yes. B is a rate or tariff under the refund, but that has a fixed term. Yes. And then you potentially could have a gap period. Is that correct? You could have two gaps. There can be a gap because of a period before the refund effective date or a period after the 15 months. That's just the way Congress has written the statute. And that's correct, Your Honor. So my question then, recognizing that there could be gaps, if FERC can retroactively reset the tariff through the refund process, does that cover the gap either after or before? It does not, Your Honor. FERC's authority is what Congress provided. Section 206B provides an exception. A lot of people have used the word retroactive refunds, but I can tell you as a FERC practitioner, a retroactive refund refers to a refund that's impermissible. A retroactive refund is not a refund beginning on the refund effective date. That's just FERC issuing an order changing the authorized rate. And when it changes the authorized rate, then public utilities have to conform their conduct. If public entities have bound themselves by contract to do so, then a court will find that they also have to conform their conduct. But they must be subject to the same rules if they promise to be so. And that depends on FERC being able to make findings as to the tariffs at issue. FERC's orders said nothing about the governmental entities. FERC ruled in 2001, as FERC correctly pointed out, that it was resetting the rates applicable to all sellers under these jurisdictional tariffs, under the ISO and PX tariffs. And the reason the standing issue arises isn't because there's no potential applicability. There is. This is step one of a line. You have a FERC order that finds that the rates have been changed. Then we get to a court action over step two, whether they promise to abide by it. But it matters. That's not the reason there's a standing issue. The reason there's a standing issue is because FERC did that in 2001, and that order has already been appealed. And the Federal Power Act gives them 60 days. So why do you need the other two orders? Excuse me, Your Honor? I mean, FERC took the initiative and issued subsequent orders in this case that are before us that arguably had greater implications for the non-jurisdictional parties than the original order. Now, I think both of you would say you didn't need to. The tariff was changed by virtue of the 2001 order and the subsequent proceeding before this Court. So they're only gripe is to these subsequent orders. They want to be able to argue they don't apply. Why not vacate the orders? Isn't it your client, though, that wanted the additional order and the clarification? Those are critical points, and I'd like to say two things about them. One is that the critical point on the new order is that all FERC was doing was clarifying what it already said. The reason we made a fine with the commission is because we wanted to be clear that what they were doing was implementing this Court's mandate by vacating every part of their orders in which they had ordered governmental entities to pay refunds. But we also wanted to make clear what they weren't vacating, that they weren't vacating their decision that the ISO and PX tariff rates had been revised back in 2001 because that's step one of the Alliant of an Alliant action. So we asked them to make that clear, and it's, in fact, true. In 2001, they made that finding. And there is no standing here, or I would say no statutory right for them to appeal because the statute gives you 60 days to file an appeal, and they didn't appeal this issue. They appealed other issues from the same orders. Now they come back five years later. They have to work five years down the road of pursuing this alternative path and are now arguing that back in 2001 the commission erred by also saying that they could modify rates. But a second part on this point. So let me ask you, would you, would your client have been able to appeal if FERC said in its clarifying order, well, we really didn't reset rates, all we did was basically follow subsection B in the refunds? If an agency reopens its order, reconsiders it, then, yes, there is a right to appeal. But conversely, where an agency simply explains its prior order and leaves it unchanged, then there is no right to appeal. And I would point to the principal case that was cited by the Bonneville Power Administration in its reply brief, the Brotherhood of Locomotive Engineers case, in which the Supreme Court specifically said precisely the opposite of what the government cites the case for, specifically held that where the agency makes no   to the Supreme Court's rehearing, that that is not a reviewable order. And in that case, the Supreme Court dismissed the appeal on the exact grounds that we are asking that the appeal be dismissed here. Very good. Thank you, counsel. Thank you very much. A couple of brief points. Judge McKeown, you had asked whether there was any practical consequence, whether you ordered refunds or actually revised rates retroactively. I would like to say there are some significant practical consequences if the commission were to be upheld. If, for example, the commission had ordered, actually ordered rates to be revised retroactively, and that includes both terms and conditions of service, because that's the authority they're claiming. Suppose you had a company that sold at one rate, and now they're told that the rate that they actually were charging was a violation of their tariff. They would face not only refund consequences, which is jurisdictional entities, but they would face potential liability for violating the Federal Power Act and fines for doing so. That's a consequence of treating it unnecessarily as a rate change when all they have to do in order to order refunds is to use the rate, the prospective rate, benchmarked rate, as the counsel for FERC called it, as a reference point, not as an actual revision to the tariff. Suppose, for example, the utility had been told by the commission that its credit worthiness provisions were too lax, and it should have had more stringent ones. If you revised that retroactively, then they were actually selling to customers to whom they shouldn't have been selling. Customers were purchasing who weren't qualified. That has consequences that are unforeseeable. Were they in violation of their bond requirements? Did they face tariff fines for violating the tariff? All this is unnecessary, and its consequences that flow from an unnatural reading of the statute. Counsel has also said that there was a – that all the commission was doing was clarifying the July order. But the commission certainly did revise rates. In June, they did. That's a requirement before you can order refunds. So resetting rates is – they do that prospectively, but resetting them retroactively is not something they did in the July 21st order. They talked about refund methodology throughout the order. And that's consistent with the statute. It's consistent with what they said in the July 25th order, where they said we don't have the authority to revise rates retroactively. That would be the natural reading of the order. There would be no reason for us to seek rehearing or seek review of that, especially where our issue was whether FERC had any authority to revise our rates at all. So there's no reason why we would have raised that in the court of appeals. Last, I'll just simply say that on Alliant, Alliant was a section 205 case. And as the court in, I think, I believe it was the city of Anaheim in the D.C. circuit has said, 205 and 206 are quite different statutes. And when you have a rate put into effect provisionally under section 205, as it was in the Alliant case, then the commission has authority that it lacks under section 206. 206B only gives them retro authority to revise, to order refunds and to revise rates prospectively, use that as a benchmark and establish the refunds. They're not denied that authority at all. And the only reason they've mentored an opinion in this case that we can tell is to provide some aid for the plaintiffs to continue their litigation. There was no practical consequence, as they said, to do this with respect to the rates  Thank you, counsel. The case just heard will be submitted for decision and it will be in recess for the afternoon.
judges: Thomas, McKeown, Clifton, Cjj